UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHARLES JONES, | ) | NO. EDCV 08-1001-CT |
| Plaintiff, | ) | OPINION AND ORDER |
| v. | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| Defendant. | ) | |

For the reasons set forth below, it is ordered that judgment be entered in favor of defendant Commissioner of Social Security ("the Commissioner") because the Commissioner's decision is supported by substantial evidence and is free from material legal error.

### SUMMARY OF PROCEEDINGS

On July 30, 2008, plaintiff, Charles Jones ("plaintiff"), filed a complaint seeking judicial review of the denial of benefits by the Commissioner pursuant to the Social Security Act ("the Act"). On November 11, 2008, plaintiff filed a brief with points and authorities in support of remand or reversal. On December 11, 2008, the Commissioner filed a brief in opposition to plaintiff's brief.

SUMMARY OF ADMINISTRATIVE RECORD

1.   Proceedings

On April 25, 2006, plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability since November 21, 2002 due to schizophrenia, depression, two torn rotor cuffs, knee pain, carpal tunnel, and back injury.  (TR 39-41, 66-72).[1] The application was denied initially and upon reconsideration.  (TR 34-38).

On June 18, 2007, plaintiff filed a request for a hearing before an administrative law judge ("ALJ").  (TR 28).  On November 7, 2007, plaintiff, represented by an attorney, appeared and testified before an ALJ.  (TR 370-405).  The ALJ also considered vocational expert ("VE") testimony.  On May 6, 2008, the ALJ issued a decision that plaintiff was not disabled, as defined by the Act, and thus was not eligible for benefits, because plaintiff maintained the residual functional capacity to perform a limited range of light work, which enabled him to perform a substantial number of jobs that exist in the economy.  (TR 11-20).

On June 21, 2008, the Social Security Appeals Council denied plaintiff's request to review the ALJ's decision.  (TR 2-3).  Accordingly, the ALJ's decision stands as the final decision of the Commissioner.  Plaintiff subsequently sought judicial review in this court.

---

[1]     "TR" refers to the transcript of the record of administrative proceedings in this case and will be followed by the relevant page number(s) of the transcript.

2.   <u>Summary Of The Evidence</u>

The ALJ's decision is attached as an exhibit to this opinion and order and, except as otherwise noted, materially summarizes the evidence in the case.

<u>PLAINTIFF'S CONTENTIONS</u>

Plaintiff essentially contends as follows:

1.   The ALJ improperly determined that the plaintiff could perform the information clerk, parking lot signaler, and counter clerk jobs described in the Dictionary of Occupational Titles ("DOT");

2.   The ALJ failed to properly consider the severity of plaintiff's impairments when he failed to properly consider the opinion of plaintiff's treating orthopedic surgeon, Dr. Khalid Ahmed;

3.   The ALJ failed to properly consider the plaintiff's testimony.

<u>STANDARD OF REVIEW</u>

Under 42 U.S.C. §405(g), this court reviews the Commissioner's decision to determine if: (1) the Commissioner's findings are supported by substantial evidence; and, (2) the Commissioner used proper legal standards. <u>Macri v. Chater</u>, 93 F.3d 540, 543 (9th Cir. 1996). Substantial evidence means "more than a mere scintilla," <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971), but less than a preponderance. <u>Sandgathe v. Chater</u>, 108 F.3d 978, 980 (9th Cir. 1997).

When the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, however, the Court may not substitute its judgment for that of the Commissioner. <u>Flaten v. Secretary of Health and Human Services</u>, 44 F.3d 1453, 1457 (9th Cir. 1995).

3

1                         DISCUSSION

2   1.   The Sequential Evaluation

3        A person is "disabled" for the purpose of receiving social security

4   benefits if he or she is unable to "engage in any substantial gainful

5   activity by reason of any medically determinable physical or mental

6   impairment which can be expected to result in death or which has lasted

7   or can be expected to last for a continuous period of not less than 12

8   months."   42 U.S.C. §423(d)(1)(A).

9        The Commissioner has established a five-step sequential evaluation

10  for determining whether a person is disabled.   First, it is determined

11  whether the person is engaged in "substantial gainful activity."   If so,

12  benefits are denied.

13       Second, if the person is not so engaged, it is determined whether

14  the person has a medically severe impairment or combination of

15  impairments.   If the person does not have a severe impairment or

16  combination of impairments, benefits are denied.

17       Third, if the person has a severe impairment, it is determined

18  whether the impairment meets or equals one of a number of "listed

19  impairments." If the impairment meets or equals a "listed impairment,"

20  the person is conclusively presumed to be disabled.

21       Fourth, if the impairment does not meet or equal a "listed

22  impairment," it is determined whether the impairment prevents the person

23  from performing past relevant work.   If the person can perform past

24  relevant work, benefits are denied.

25       Fifth, if the person cannot perform past relevant work, the burden

26  shifts to the Commissioner to show that the person is able to perform

27  other kinds of work.   The person is entitled to benefits only if the

28                              4

person is unable to perform other work.  20 C.F.R. § 404.1520; <u>Bowen v.</u>
<u>Yuckert</u>, 482 U.S. 137, 140-42 (1987).

2.   <u>Issues</u>

    A.   <u>Step 5 Determination</u> (Issue 1)

    At step 5 of the sequential evaluation, the ALJ found, based on the testimony of the VE, David Rinehart, that plaintiff could perform the following jobs described in the Dictionary of Occupational Titles ("DOT"): information clerk (DOT No. 237.237-018), parking lot signaler (DOT No. 916.667-014), and counter clerk (DOT No. 249.366-010). Plaintiff contends that the requirements of these jobs are not consistent with his RFC as assessed by the ALJ.

    "The DOT 'is not the sole source of admissible information concerning jobs.'"   <u>Johnson v. Shalala</u>, 60 F.3d 789, 795 (9th Cir. 1995), quoting <u>Barker v. Shalala</u>, 40 F.3d 789, 795 (6th Cir. 1994). "'The Secretary may take administrative notice of any reliable job information, including . . . the services of a vocational expert.'" <u>Id.</u>, quoting <u>Whitehouse v. Sullivan</u>, 949 F.2d 1005, 1007 (8th Cir. 1991).

    "Introduction of evidence of the characteristics of specific jobs available in the local area through the testimony of a vocational expert is appropriate, even though the job traits may vary from the way the job title is classified in the DOT."   <u>Johnson v. Shalala</u>, 60 F.3d at 795. Thus, "an ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation."   <u>Id.</u>

    Here, the ALJ concluded that plaintiff has the following residual functional capacity:

1    [Plaintiff] can lift and carry 20 pounds occasionally and 10
      pounds frequently, sitting for 6 hours out of an eight hour
2    day with normal workday breaks, and standing/walking for six
      hours out of an eight hour day with normal workday breaks
3    except that he is limited to occasional posturals of climbing
      balancing, stooping, kneeling, crouching and crawling, and
4    occasional use of his upper extremities for fine and gross
      manipulation. [Plaintiff] is restricted with performing
5    overhead work, and from walking on uneven terrain.   From a
      mental standpoint, he is limited to simple repetitive tasks.
6    (TR 15).

7         The ALJ found that the vocational expert's testimony was consistent

8    with the information contained in the DOT.[2]  However, as plaintiff points

9    out, his assessed RFC is not consistent with the ability to perform the

10   information clerks job or the parking lot signaler job.  The information

11   clerk job requires a "reasoning level" of 4, which means that the

12   employee is able to reason at a level well in excess of the abilities of

13   a person limited to "simple, repetitive tasks."[3]  See DOT No. 237.367-

14   018, available at 1991 WL 672187 (G.P.O.).  Similarly, the parking lot

15

16   _____

17        [2]The ALJ did not specifically ask the VE whether his
      testimony was consistent with the DOT, although he had an
18   affirmative duty to do so under Social Security Ruling ("SSR")
      00-4p, See Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir.
19   2007).  However, any error was harmless because, as discussed
      below, the description of the counter clerk job in the DOT in
20   fact does not conflict with plaintiff's assessed RFC or the VE's
      testimony that plaintiff could perform such a job.

21
          [3]Reasoning Level 4 requires an employee to be able to:
22
          Apply principles of rational systems to solve practical
23        problems and deal with a variety of concrete variables in
          situations where only limited standardization exists.
24        Interpret a variety of instructions furnished in written,
          oral, diagrammatic or schedule form.  Examples of rational
25        systems are: bookkeeping, internal combustion engines,
          electric wiring systems, house building, farm management,
26        and navigation.

27   See DOT, Appendix C, at 1991 WL 688702.

28                                   6

1 signaler job requires frequent handling, which is inconsistent with the
2 limitation to only occasional fine and gross manipulation. See DOT No.
3 915.667-014, available at 1991 WL 687870 (G.P.O.).

4      Nonetheless, the VE's testimony concerning the counter clerk job is
5 consistent with the DOT and plaintiff's assessed RFC.    Plaintiff
6 contends that he cannot perform the counter clerk job because he is
7 limited to simple, repetitive tasks and a counter clerk may be required
8 to deal with people and answer customer's questions regarding prices and
9 services.    See DOT No. 249.366-010, available at 1991 WL 672323
10 (G.P.O.).    However, the counter clerk job is unskilled work that
11 requires only a month or less to learn and a reasoning level of 2, which
12 is consistent with a limitation to performing simple, repetitive tasks.[4]
13 See Meissl v. Barnhart, 403 F.Supp.2d 981, 983-84 (C.D. Cal.
14 2005)(finding that a limitation to simple tasks performed at a routine
15 pace did not preclude plaintiff from performing jobs that required a
16 reasoning level of two).

17      The ALJ's finding that plaintiff could perform other jobs that
18 exist in substantial numbers in the economy is free from material error
19 and supported by substantial evidence.[5]

20 ────────────────

21      [4]The counter clerk job is light work that requires only
occasional handling and reaching.  See DOT No.  249.366-010, 1991
22 WL 672323 (G.P.O.).

23      [5]The VE testified that there are 950 counter clerk jobs
locally and 27,000 jobs nationally, which the ALJ found
24 constitutes a significant number.  See Meanel v. Apfel, 172 F.3d
1111, 1115 (9th Cir. 1999)(finding that between 1,000 and 1,500
25 jobs in the regional economy constitutes a significant number
under the Act); Barker v. Secretary of Health and Human Services,
26 882 F.2d 1474, 1478-79 (9th Cir. 1989)(finding that 1,266 jobs in
regional economy constitutes a significant number and is within
27 the range found significant by other courts, which found as few

28                                      7

1          B.   <u>Treating Physician</u> (Issues 2 and 3)

2      Plaintiff contends that the ALJ erred in failing to properly

3 consider the November 16, 2006 opinion of plaintiff's treating

4 physician, Khalid B. Ahmed, M.D.  (<u>See</u> TR 325).

5      A treating physician's opinion generally is entitled to great

6 weight.  <u>See</u> <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995)

7 (citation omitted).  "The treating physician's opinion is not, however,

8 necessarily conclusive as to either a physical condition or the ultimate

9 issue of disability." <u>Id.</u>  The weight given a treating physician's

10 opinion depends on, among other things, whether it is supported by

11 sufficient medical data and is consistent with other evidence in the

12 record.  <u>See</u> 20 C.F.R. § 404.1527.

13     "The ALJ may disregard the treating physician's opinion whether or

14 not that opinion is contradicted." <u>Andrews v. Shalala</u>, 53 F.3d at 1041

15 (citation omitted).  To reject the uncontroverted opinion of plaintiff's

16 physician, the ALJ must present clear and convincing reasons for doing

17 so.  <u>Id.</u>  If the treating physician's opinion is contradicted by other

18 doctors, the Commissioner may not reject the opinion without providing

19 "specific and legitimate reasons" for doing so which are supported by

20 substantial evidence. <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir.

21 2001) (citation omitted).  "'The ALJ can meet this burden by setting out

22 a detailed and thorough summary of the facts and conflicting clinical

23 evidence, stating [his] interpretation thereof, and making findings.'"

24 <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008), quoting

25 <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989).

26

27 ─────────────────────

as 500 regional jobs a significant number).

28

1    Here, the issue before the ALJ was whether plaintiff was disabled

2  before his last insured date, which was September 30, 2005.[6] (See TR

3  11). "[M]edical evaluations made after expiration of a [plaintiff's]

4  insured status are relevant to an evaluation of the pre-expiration

5  condition." Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988).

6  However, the ALJ may also consider contemporaneous medical records,

7  which may be more persuasive than subsequent retrospective medical

8  opinions. See Flaten v. Secretary of Health & Human Services, 44 F.3d

9  at 1461, 1463.

10    Here, the ALJ considered the medical evidence before him and

11 determined that plaintiff had the following serious impairments: carpal

12 tunnel syndrome with status post carpal tunnel release surgeries, right

13 knee internal derangement with status post arthroscopy, bilateral

14 impingement syndrome of the shoulders, status post left rotator cuff

15 repair, degenerative disc changes/protrusions in the spine, and

16 schizoaffective disorder. (TR 13). As noted above, the ALJ found that

17 these impairments limited plaintiff to a range of light work. (TR 13).

18    The medical evidence of record in this case consists essentially of

19 reports and evaluations prepared in connection with plaintiff's worker's

20 compensation action against his employer and includes a number of

21 supplemental progress reports submitted by Dr. Ahmed, an orthopedic

22

23    [6]In order to qualify for Title II benefits, plaintiff must
   establish that he became disabled, as defined by the Act, before
24 the date on which his insured status expired. See Flaten v.
   Secretary of Health & Human Services, 44 F.3d 1453, 1458 (9th
25 Cir. 1995)(where plaintiff applies for benefits after the
   expiration of his insured status based on a current disability,
26 the plaintiff "must show that the current disability has existed
   continuously since some time on or before the date their insured
27 status lapsed").

28

surgeon who began treating plaintiff in 2003 in connection with plaintiff's worker's compensation case. (See TR 119-83; 315-69; see also TR 186 (noting that plaintiff began treating with Dr. Ahmed through his attorney in 2003)). Dr. Ahmed's reports document plaintiff's complaints, some findings on examination, and Dr. Ahmed's diagnoses, some of which changed over time. In addition, the reports contain Dr. Ahmed's treatment recommendations and his repeated opinion that plaintiff is "temporarily totally disabled from work." (See, e.g., TR 120, 125, 128, 133, 137, 141, 145, 149, 152, 157, 161, 164, 167, 170, 173, 176).

The record also contains the reports of the Agreed Medical Evaluator,[7] Dr. Eric Sabety, who conducted an orthopedic examination of plaintiff on January 31, 2007, and a Qualified Medical Examiner,[8] Dr. G. Sunny Uppal, who conducted an orthopedic examination of plaintiff on may 4, 2005. Both Dr. Sabety and Dr. Uppal made specific findings after a thorough examination of plaintiff and review of plaintiff's medical records, including Dr. Ahmed's records. (TR 215-22; 286-90). They found plaintiff's condition to be permanent and stationary. (TR 222, 290).

Neither Dr. Sabety nor Dr. Uppal found that plaintiff was totally

---

[7] In a worker's compensation dispute, an Agreed Medical Evaluator ("AME") is a "physician selected by agreement between the employer and the employees to resolve disputed medical issues referred by the parties in a worker's compensation proceeding." Cal. Code Regs., tit. 8, § 1(c).

[8] A "Qualified Medical Evaluator" ("QME") means a physician licensed by the appropriate licensing body for the State of California and appointed pursuant to California Labor Code Section 139.2. Cal. Code Regs., tit. 8, § 1(t).

disabled from performing any work.  Dr. Uppal assessed work restrictions and found that plaintiff was a qualified injured worker.  (TR 290-91). Dr. Sabety found, in contrast to Dr. Ahmed, that "[t]here were no credible periods of temporary disability that one could associate with a work related injury."  (TR 222).  Dr. Sabety assessed some work restrictions but found that the only periods of temporary disability were the three months after plaintiff's left shoulder and right carpal tunnel release surgeries, "[o]therwise, he was capable of working at his regular duty."  (TR 222, 225).

The state agency physicians reviewed plaintiff's records and found plaintiff capable of light work with only occasional postural changes, no overhead work, and frequent bilateral fingering and handling.  (TR 313-14).

The ALJ considered the limitations assessed by the state agency physicians and Drs. Uppal and Sabety, found them "appropriate", and "incorporated their opinions in the [plaintiff's] residual functional capacity."  (TR 17).  In fact, the ALJ's assessed RFC, which is restrictive, is consistent with the limitations assessed by these physicians.[9]

---

[9]Dr. Uppal found that with respect to plaintiff's shoulder impairments, plaintiff was precluded from heavy lifting and repetitive over-the-shoulder activity.  With respect to the left hand, Dr. Uppal precluded plaintiff from heavy lifting.  Finally, the doctor precluded plaintiff from prolonged standing or walking on uneven surfaces.  (TR 290).  Dr. Sabety precluded plaintiff from overhead work with the left arm, repetitive pushing or pulling and heavy lifting on the left side, and from heavy lifting and repetitive gripping on the right side.  (TR 222).

Here, the ALJ's assessed limitations were consistent with those assessed by Drs. Uppal and Sabety.  Macri v. Chater, 93 F.3d 540, 543-44 (9th Cir. 1996)(ALJ is entitled to draw logical

However, the ALJ found that the opinion of continuing temporary total disability (in worker's compensation terminology) by Dr. Ahmed "of limited value as it is conclusory and without specifics to the [plaintiff's] functional capacity." (TR 18). This finding is supported by the record and a proper reason for discounting the doctor's opinion. See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002)(when evaluating conflicting medical opinions, "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."). Dr. Ahmed conducted examinations of plaintiff according to the plaintiff's complaints at each visit, but those examinations essentially revealed symptoms of the impairment found and considered by the ALJ, the complaints and findings fluctuate, and there is no explanation or support for Dr. Ahmed's finding that the symptoms are continually temporarily totally disabling. Moreover, Dr. Ahmed's determination that plaintiff was continually temporarily totally disabled under California worker's compensation law is an administrative decision that is not entitled to special deference. See 20 C.F.R. § 404.1527(e)(1); Magallanes v. Bowen, 881 F.2d at 751.

---

inferences from findings in worker's compensation context). For example, the limitations to light work (plaintiff's past work involved lifting up to 100 pounds) and to standing and walking for six hours out of eight with no walking on uneven terrain, (TR 15, 97), are consistent with Dr. Sabety and Dr. Uppal's preclusion from heavy lifting, prolonged standing, and walking on uneven surfaces. See Administrative Director, Dept. Of California, "Schedule for Rating Permanent Disabilities" (April 1, 1997) at 2-14, 2-19 (disability precluding heavy lifting contemplates that individual will have lost 50% of pre-injury capacity and disability precluding prolonged weight bearing contemplates ability to work in standing and walking position 75% of the time).

In addition, as the ALJ noted, "[t]here is ample evidence by way of the examining source opinions of Dr. Uppal and Dr. Sabety and the State Agency consultant which are contradictory to Dr. Ahmed's opinion and serve as a substantial reason to discount the expression of disability." (TR 18).   These examining and non-examining opinions are supported by independent clinical findings and constitute substantial evidence supporting the ALJ's decision.[10]   See Thomas v. Barnhart, 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record").

Plaintiff also contends that the ALJ had a duty to develop the record by contacting Dr. Ahmed if the ALJ felt the doctor's opinion was not adequately supported in the record.   "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

---

[10]Plaintiff states that the ALJ failed to properly consider the evidence of his mental impairment, but the only evidence plaintiff cites is Dr. Ahmed's orthopedic evaluation. (Plaintiff's Brief at 4-5).   Although Dr. Ahmed's reports sporadically mention that plaintiff suffers from depression and anxiety, Dr. Ahmed is an orthopedic surgeon, not a psychiatrist, and there is no indication that he conducted any psychological evaluation of plaintiff.   The ALJ limited plaintiff to simple, repetitive tasks to accommodate plaintiff's psychological impairment and the ALJ's limitations are supported by the findings of QME Kaitlin Basset, M.D., from the relevant period. (TR 14, 228-67).   A later 2007 evaluation found that plaintiff's psychiatric condition had worsened (TR 109-13), but the ALJ properly attributed more weight to the contemporaneous opinions of Dr. Bassett.   See Flaten, 44 F.3d at 1461 n. 4 (in cases involving retrospective diagnosis, any deterioration in plaintiff's condition since the last insured date is irrelevant).

1  Cir. 2001(citation omitted); see also 20 C.F.R. § 404.1512(e)(1)(agency

2  will recontact or seek additional information from treating source if

3  the information received is ambiguous or inadequate for the agency to

4  reach a decision).   However, in this case, the ALJ did not find the

5  record inadequate and did not find Dr. Ahmed's opinion of continuing

6  temporary total disability ambiguous.   Instead, the ALJ found the

7  opinion conclusory and contrary to the opinions of other medical

8  opinions that were better supported.

9       The ALJ did not materially err in his consideration of Dr. Ahmed's

10 opinions and his decision is supported by substantial evidence in the

11 record.

12      C.   Credibility Determination (Issue 4)

13      Plaintiff finally contends that the ALJ erred in assessing the

14 credibility of his testimony.

15      To reject a plaintiff's subjective complaints, the ALJ "must

16 provide cogent reasons for the disbelief." Greger v. Barnhart, 464 F.3d

17 968, 972 (9th Cir. 2006)(citation omitted).   In the absence of evidence

18 of malingering, the ALJ's reasons for rejecting plaintiff's testimony

19 "must be clear and convincing." Id. (citation omitted).   Moreover, when

20 an ALJ "finds that a [plaintiff's] testimony relating to the intensity

21 of his pain and other limitations is unreliable, the ALJ must make a

22 credibility determination citing the reasons why the testimony is

23 unpersuasive." Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599

24 (9th Cir. 1999)(citation omitted).   In making a credibility determination

25 the ALJ "must specifically identify what testimony is credible and what

26 testimony undermines the [plaintiff's] complaints."   Id. (citations

27 omitted).   "If the ALJ's credibility finding is supported by substantial

28                                  14

evidence in the record, [the court] may not engage in second guessing." Thomas v. Barnhart, 278 F.3d at 958 (citation omitted).

Here, plaintiff cites his testimony from the 2008 hearing and contends that the ALJ failed to discuss that testimony or provide reasons for discrediting it.  However, the ALJ did not completely reject plaintiff's testimony and considered his subjective complaints in determining plaintiff's RFC, which was a limited range of light work. (TR 17).  For example, the ALJ noted that plaintiff's musculoskeltal complaints are accommodated by the restriction to light work and his complaints about trouble raising his arms up to shoulder level (TR 392) are addressed by the limitation on overhead reaching.  (TR 17).

As the ALJ observed, these complaints have been partially responsive to conservative care and improved with surgical intervention. For example, plaintiff testified that his shoulder problems improved after surgery, but that his right shoulder was now giving him problems due to a rotator cuff tear that occurred in 2007, long after his last-insured date.  (TR 123, 388-90).  Similarly, his back complaints have been intermittent (especially prior to 2006), have been treated conservatively, and the treatments have given plaintiff some relief. (TR 187, 277, 319, 339-41).  See Tommasetti v. Astrue,533 F.3d at 1040 (favorable response to conservative treatment is a basis for discounting plaintiff's allegations of disabling pain).

Although plaintiff admitted that his left hand was a lot better as a result of his carpal tunnel release surgery, (TR 391), he complained that his right hand gave him trouble opening jars, he had trouble holding and gripping tools when fixing his car, and had trouble typing for more than fifteen minutes on his computer.  (TR 397).  However, the

15

ALJ limited plaintiff to light work with only occasional use of upper extremities for fine and gross manipulation. The counter clerk job that the ALJ found plaintiff could perform does not require typing on a computer for long periods of time and requires only occasional handling and fingering. See DOT No. 249.366-010 at 1991 WL 672323 (G.P.O.).

Similarly, the ALJ found that plaintiff's knee complaints are accommodated by a restriction against walking on uneven surfaces and normal work breaks and only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (TR 15, 17-18). The fact that plaintiff testified that he sometimes wears a Teflon knee brace when his knee is bothering him does not require a different finding. (TR 393). Although his medical records show flare-ups of knee pain, (see, e.g., TR 147-48), plaintiff reported improvement with the knee brace, (TR 139, 143), and, as the ALJ noted, was reported to have a normal gait at his examination by Dr. Sabety and past arthroscopy but no abnormalities in knee function when examined by Dr. Uppal. (TR 215, 288).

In addition, the ALJ found an inconsistency between plaintiff's complaints of fatigue and problems concentrating and his significant daily activities, which included daily walks to the park, visiting his cousin, shopping for groceries, and cooking. (TR 236). The ALJ also noted that plaintiff was alert and oriented when he was examined by Dr. Bassett in 2005 and showed normal functioning on tasks requiring attention and concentration despite complaining to Dr. Bassett about his decreased concentration. (TR 236, 271-72). Such inconsistencies between plaintiff's reported symptoms and his functioning are an appropriate basis for discounting his complaints. See Tonapetyan v. Halter, 242 F.3d at 1148. Moreover, the ALJ limited plaintiff to

16

simple, repetitive tasks and his assessment was consistent with the findings and opinions of Dr. Bassett.[11]   (TR 14-15, 228-49).

The ALJ properly considered plaintiff's testimony concerning his subjective complaints.

CONCLUSION

Plaintiff clearly has severe impairments.  However, a plaintiff who can still perform work in the national economy, even with a severe impairment, is not disabled as that term is defined by the Act.  See generally Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991). Furthermore, if the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner.   Flaten v. Secretary of Health and Human Services, 44 F.3d at 1457.

After careful consideration of the record as a whole, the magistrate judge concludes that the Commissioner's decision is supported by substantial evidence and is free from material legal error. Accordingly, it is ordered that judgment be entered in favor of the Commissioner.

DATED: Dec. 18, 2008

CAROLYN TURCHIN
UNITED STATES MAGISTRATE JUDGE

-------------

[11]Dr. Bassett's testing also show "a slight tendency to exaggerate symptoms."  (TR 239).

17

**SOCIAL SECURITY ADMINISTRATION**
Office of Disability Adjudication and Review

**11**

### DECISION

**IN THE CASE OF**

Charles S. Jones
_____
(Claimant)

_____
(Wage Earner)

**CLAIM FOR**

Period of Disability and Disability Insurance
Benefits
_____

_____
(Social Security Number)

### JURISDICTION AND PROCEDURAL HISTORY

On April 25, 2006, the claimant filed an application for a period of disability and disability insurance benefits, alleging disability beginning November 21, 2002. The claim was denied initially and upon reconsideration. Thereafter, the claimant filed a timely written request for hearing on June 26, 2007 (20 CFR 404.929 *et seq.*). The claimant appeared and testified at a hearing held on November 7, 2007, in Orange, CA. David Rinehart, an impartial vocational expert, also appeared at the hearing. The claimant is represented by George Johnston, an attorney.

### ISSUES

The issue is whether the claimant is disabled under sections 216(i) and 223(d) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

There is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through September 30, 2005. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned Administrative Law Judge concludes the claimant has not been under a disability within the meaning of the Social Security Act from November 21, 2002 through the expiration of his insured status.

### APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is

See Next Page



disabled (20 CFR 404.1520(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574 and 404.1575). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e) and 404.1545; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long

See Next Page


EXHIBIT

Charles S. Jones <span style="background:black">████</span>

**13**

enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b) and 404.1565). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g) and 404.1560(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

1.   **The claimant meets the insured status requirements of the Social Security Act through September 30, 2005.**

2.   **The claimant has not engaged in substantial gainful activity since November 21, 2002, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).**

3.   **The claimant has carpal tunnel syndrome with status post carpal tunnel release surgeries, right knee internal derangement with status post arthroscopy, bilateral impingement syndrome of the shoulders, status post left rotator cuff repair, degenerative disc changes/protrusions in the spine and a schizoaffective disorder which more than minimally restrict his ability to engage in work related tasks and as a result, are severe within the meaning of the regulations (20 CFR 404.1520(c)).**

4.   **The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

A comparison of the objective medical findings with the criteria of Sections 1.01 and 11.01 establishes that the claimant does not have any presumptively disabling impairments of the musculoskeletal or neurological systems.

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of

See Next Page



Charles S. Jones ███████

activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In July 2005, the claimant underwent a psychiatric examination with Katalin Bassett, M.D. (Pg 142). The examination included a battery of psychological tests, including the Wechsler Adult Intelligence II, the Bender-Gestalt, Trail Making Test, and REYS 15. Regarding daily activities, the claimant told the examiner that he drove to a park, visited with his cousin, did household chores including grocery shopping and cooking, and that other chores of cleaning, cutting the grass and doing laundry were performed with the help of his children. Based on the mental status examination, psychological test results, her observation of the claimant's functioning and his descriptions of how he was doing, and a review of medical records, Dr. Bassett concluded the claimant's psychiatric symptoms were quite mild and stable. His ability to comprehend, follow and perform simple and repetitive tasks was impaired to only a very slight degree; his ability to perform work at a pace appropriate to a given work load was slightly to moderately impaired; and his ability to get along with coworkers, peers, and to respond appropriately to evaluation or criticism was slightly to moderately impaired.

The record contains a report of a psychiatric evaluation completed in October 2007 with Perry Maloff, M.D. (Pg 261). The claimant was psychotic and severely depressed and in Dr. Maloff's opinion, his condition had deteriorated since he had discontinued treatment and faced additional orthopedic surgery. Dr. Maloff made a recommendation for medication and individual psychotherapy. This evaluation was completed two years following the expiration of the claimant's insured status. While it may well be that the claimant's status has deteriorated in the absence of psychiatric treatment, the best indicator of the claimant's functioning within the relevant period at issue is shown by the comprehensive evaluation of Dr. Bassett. The scope and testing of her examination is much more extensive than Dr. Maloff's.

Thus, on the basis of the examination of Dr. Bassett, the claimant has slight restriction in daily activities, slight to moderate difficulties in social functioning, and slight to moderate difficulties in maintaining concentration, persistence and pace. There are no documented episodes of decompensation.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" and "paragraph C" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment

See Next Page



Charles S. Jones ████████████                                    Page 5 of 10

**15**

used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Accordingly, the undersigned has translated the above "B" and "C" criteria findings into work-related functions in the residual functional capacity assessment below.

**5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work which permits lifting and carrying 20 pounds occasionally and 10 pounds frequently, sitting for six hours out of an eight hour day with normal workday breaks, and standing/walking for six hours out of an eight hour day with normal workday breaks except that he is limited to occasional posturals of climbing, balancing, stooping, kneeling, crouching and crawling, and occasional use of his upper extremities for fine and gross manipulation. He is restricted with performing overhead work, and from walking on uneven terrain. From a mental standpoint, he is limited to simple repetitive tasks.**

In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) describes the kinds of evidence, including the factors below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:

1. The claimant's daily activities;

2. The location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

See Next Page



4. The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

The claimant alleged that he was disabled and unable to work due to schizophrenia/depression; two torn rotator cuffs; knee problems; carpal tunnel; and a back injury; that he was unable to lift; that he had constant pain; that he was unable to bend and had difficulty with sitting for long periods of time; that he isolated himself from others; that paranoia sets in; and that he had difficulty working with others.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The medical records disclosed the claimant has a history of various work related injuries extending back to at least September 2001 which included both shoulders, low back and left wrist. MRI of the shoulders confirmed bilateral rotator cuff tear. There were subsequent surgeries in November 2002 for a left shoulder rotator cuff repair, in October 2003 for a left carpal tunnel release, and in January 2004 for a right knee lateral release (Pg 74).

A series of records submitted by Khalid Ahmed, M.D., documented the claimant's treatment beginning in January 2005. Objective findings noted in his records included positive impingement sign in both shoulders with atrophy of the deltoid and rotator cuff muscles, positive Tinel's signs over both carpal tunnels with decreased grip strength in both wrists, unstable ulnar and radial collateral ligaments in both thumbs, positive varus and mild edema in the right knee, and restricted lumbar range of motion with positive straight leg raising on the left. In December 2005 a right carpal tunnel release was done. Examinations in May and July 2006 documented complaints of bilateral wrist pain, right knee pain and the new development of left ankle pain with prolonged standing, kneeling and squatting and locking in the left elbow. X-rays of the left ankle showed evidence of mild to moderate hypertrophic changes. Studies of the left elbow were consistent with postsurgical changes with some bony synostosis of the proximal radius and ulna, and moderate hypertrophic changes at the humeral ulnar joint space (Pg 14). MRI in September 2006 disclosed multi-level spinal canal stenosis in the thoracic and lumbar spine due to significant hypertrophy of the facet joints, degenerative spondylolisthesis of L4 upon L5, posterior annular tears, and degenerative disc changes effacing the thecal sac throughout the

See Next Page



spine (Pg 24). Nerve conduction studies of the bilateral upper extremities obtained in November 2006 were abnormal in the carpal tunnel areas (Pg 38). The latest report of Dr. Ahmed dated October 8, 2007 referenced a left shoulder arthrogram obtained in September 2007 showing a tear of the supraspinatus tendon with findings on physical examination of diminished range of motion in the left shoulder (Pg 250).

On May 4, 2005 the claimant was seen for a qualified medical examination with G. Sunny Uppal, M.D. (Pg 95). Findings on physical examination showed normal motor strength, normal reflexes at both knees and ankles and normal sensation in both lower extremities. The claimant was permanent and stationary, with work restrictions for the left shoulder against heavy lifting and repetitive over the shoulder activity; restrictions for the left hand against power gripping and heavy lifting; and restrictions with the right knee of prolonged standing or walking on uneven surfaces.

On January 31, 2007 the claimant underwent an agreed medical examination with Eric Sabety, M.D. (Pg 186). The claimant exhibited a normal gait with full range of motion of both shoulders but with some grinding with passive range of motion consistent with rotator cuff arthropathy. There was some decreased motion over the left elbow joint secondary to a prior and remote dislocation. Grip strength in both hands was normal. Dr. Sabety opined that a short, three month period of temporary disability had been appropriate following the claimant's left shoulder and right carpal tunnel surgeries, but that otherwise, the claimant had work restrictions from overhead, repetitive pushing and pulling and heavy lifting with the left arm, and from heavy lifting and repetitive gripping with the right arm (Pg 148).

The State Agency disability determination medical consultants who reviewed the evidence of record assessed the claimant with a light functional capacity with occasional posturals, no overhead work, and frequent bilateral handling and fingering (Pg 57).

The Administrative Law Judge finds the functional capacity assessments for work as set forth by Dr. Uppal, Dr. Sabety and the State agency reviewers are appropriate, and have incorporated their opinions in the claimant's residual functional capacity.

The claimant's subjective complaints do not credibly establish a more restrictive functional capacity. His musculoskeletal complaints have been partly responsive to conservative care (Pg 31, 51), further treated by surgical intervention (Pg 183, 231), and are addressed by restricting the functional capacity assessment to generally light activity. Based on his history of shoulder problems and his testimony of difficulty lifting his arms above shoulder level, a preclusion from overhead work is also included. Even though examinations show a normal gait (Pg 155), a restriction against walking on even terrain is included based on his knee problems. The claimant has some back problems which have resulted in little treatment apart from medications. Those complaints also appear to have been intermittent (Pg 183, 93). He has asserted side effects from medications of daytime fatigue and lack of concentration (Pg 239). However, his descriptions of daily activities, set forth above, reflects significant function, both physically and mentally. Additionally, the claimant has been characterized in the record as being alert and oriented (Pg 102). He has also been able to complete a battery of psychological tests with results showing normal functioning on tasks requiring attention and concentration (Pg 100). This is not

See Next Page



consistent. His complaints of pain with prolonged standing, kneeling or squatting are addressed by a residual functional capacity which allows for normal work day breaks and accommodated by the inclusion of occasional posturals. Subjectively, physicians examining the claimant have characterized his wrist complaints as intermittent and increasing to moderate with heavy lifting and repetitive gripping (Pg 148). A residual functional capacity which allows for light work and occasional fine and gross manipulation accommodates those complaints.

In terms of the other opinion evidence, the claimant's treating physician, Dr. Ahmed, continued the claimant on the status of temporary total disability. This opinion is of limited value as it is conclusory and without specifics to the claimant's functional capability. A review of his treatment notes during the relevant period at issue are also basically repetitious as to the recommended treatment, which included physical therapy and medications. There is ample evidence by way of the examining source opinions of Dr. Uppal and Dr. Sabety and the State Agency consultant which are contradictory to Dr. Ahmed's opinion and serve as a substantial reason to discount the expression of disability.

For all the aforementioned reasons, the Administrative Law Judge does not find a basis in the record for a more restrictive residual functional capacity.

6.   **The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

The claimant has past relevant work as a site director and instructor. The vocational evidence reflects that the job of site director is classified by the Dictionary of Occupational Titles as sedentary skilled work (SVP 8) (Dictionary of Occupational Titles No. 099.117-010), but that it was done at the light level as performed by the claimant. The job of instructor was light skilled work (SVP 7) (097.221-010). Based on the testimony of the vocational expert that the demands of these jobs exceed the claimant's residual functional capacity, he is unable to perform past relevant work.

7.   **The claimant was born on April 10, 1951 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563). At age 54 as of the expiration of his insured status on September 30, 2005, the claimant was still considered as an individual closely approaching advanced age.**

8.   **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).**

9.   **Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

10.  **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).**

See Next Page



In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rules 202.14 or 202.15. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as the light unskilled jobs of (1) information clerk (237.367-018), numbering 3,900 jobs locally and 70,000 in the national economy; (2) parking lot signaler (915.667-014), numbering 2,400 jobs locally and 21,200 nationally; and (3) counter clerk (249.366-010), numbering 950 jobs locally and 27,000 jobs in the national economy.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

**11. The claimant has not been under a disability, as defined in the Social Security Act, from November 21, 2002 through any time relevant to this decision (20 CFR 404.1520(g)).**

See Next Page





20

## DECISION

Based on the application for a period of disability and disability insurance benefits filed on April 25, 2006, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

_____
Keith Dietterle
Administrative Law Judge

MAY 0 6 2008
_____
Date

EXHIBIT